UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| **PAMMY HUNTER,** | } |
| | } |
| **Plaintiff,** | } |
| | } |
| v. | } |
| | }  Case No.: 5:14-cv-02313-MHH |
| **BASF CORPORATION,** | } |
| | } |
| **Defendant.** | } |

## MEMORANDUM OPINION AND ORDER

Plaintiff Pammy Hunter alleges that defendant BASF Corporation violated the Americans with Disabilities Act of 1990, 42 U.S.C § 12101 *et seq.*, by terminating her employment while she was on disability leave following a mental breakdown. (Doc. 1). Pursuant to Federal Rule of Civil Procedure 56, BASF has asked the Court to enter judgment in its favor on Ms. Hunter's claims. (Doc. 42). For the reasons stated below, the Court denies in part and grants in part BASF's motion for summary judgment.

**I.    SUMMARY JUDGMENT STANDARD**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a).  To demonstrate that there is a genuine dispute as to a material fact that precludes summary judgment, a party opposing a

motion for summary judgment must cite "to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials." FED. R. CIV. P. 56(c)(1)(A). "The court need consider only the cited materials, but it may consider other materials in the record." FED. R. CIV. P. 56(c)(3). When considering a summary judgment motion, the Court must view the evidence in the record in the light most favorable to the non-moving party and draw reasonable inferences in favor of the non-moving party. *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015).

## II.   FACTUAL BACKGROUND

Ms. Hunter, who suffers from severe depression and bipolar disorder, began her employment with BASF as a Machine Operator III in February of 2007. (Doc. 40-1, p. 16; Doc. 52, p. 2). In June of 2013, Ms. Hunter suffered a mental breakdown that prompted her to begin a period of short-term disability leave. (Doc. 40-1, p. 71; Doc. 52, p. 2). When Ms. Hunter took her leave, she was responsible for inspecting parts as they came down a conveyor belt and placing approved parts into boxes. (Doc. 40-1, pp. 20–21). Under BASF's short-term disability leave policy, Ms. Hunter's job was "protected" for six months. (Doc. 40-3, p. 14). Monica Morgan, Human Resources Manager at BASF's Huntsville

facility, testified that if Ms. Hunter had been "cleared while she was still on short-term disability and wanted to come back," then she would have been "automatically guaranteed to have a position." (Doc. 40-3, p. 14). After six months, an employee who wishes to remain with BASF, but cannot or does not wish to return to work, must apply for long-term disability leave, during which the employee's job is not protected. (Doc. 40-3, p. 14).

On July 10, 2013, Ms. Hunter began seeing psychiatrist Dr. David Anakwenze. (Doc. 44-5, p. 31; Doc. 52, p. 3). Ms. Hunter "presented initially with depression, mood fluctuations, paranoid thought[s] and suicidal ideations." (Doc. 44-5, p. 29). After meeting with Ms. Hunter on July 17, 2013, Dr. Anakwenze projected that Ms. Hunter could return to work on July 23, 2013 "on a full time basis without restrictions." (Doc. 44-5, p. 29). Following her appointment with Dr. Anakwenze on July 22, 2013, however, Ms. Hunter told Shirley Davis, the telephonic case manager (TCM) hired by BASF to manage Ms. Hunter's case, that she did not feel "ready to go back to work." (Doc. 44-5, p. 29).

Ms. Hunter continued to see Dr. Anakwenze, along with a therapist, Peggy O'Steen. (Doc. 40-1, pp. 6–7; Doc. 46, p. 3). On August 22, 2013, Ms. Davis noted in her case diary that she had received documentation from Dr. Anakwenze stating that Ms. Hunter did "not appear able to safely perform the functions of [her] job," but could likely return to work on September 15, 2013. (Doc. 44-5, p. 25).

After receiving Ms. Davis's report, Audrine Pickett, the lead counselor assigned to Ms. Hunter's case, conferred with BASF's medical director Dr. Julia Klees, who recommended that Ms. Hunter undergo an independent medical examination (IME) because Dr. Anakwenze seemed to be "going back and forth" regarding Ms. Hunter's readiness to return to work. (Doc. 44-5, p. 24; Doc. 40-4, pp. 5–6).

Dr. Keith Caruso performed an IME on Ms. Hunter on September 13, 2016 and concluded that Ms. Hunter was not able to return to work. (Doc. 44-5, pp. 16, 21). Dr. Caruso regarded Ms. Hunter as a "complicated patient to treat" and "made several medication recommendations to better address [Ms. Hunter's] symptoms." (Doc. 44-5, p. 16). Ms. Davis reported Dr. Caruso's findings on September 19, 2013 and noted that Ms. Hunter "could likely return to work in six to eight weeks," assuming that Ms. Hunter responded well to her medication adjustments. (Doc. 44-5, p. 16). Consistent with this timeline, Ms. Davis noted on October 10, 2013 that Ms. Hunter's new medication appeared to be working and that Ms. Hunter "could likely return to work in 2–3 weeks." (Doc. 44-5, p. 14).

On October 24, 2013, Dr. Anakwenze provided Ms. Hunter with a handwritten note purporting to clear Ms. Hunter to return to work without restrictions. (Doc. 40-4, p. 54; Doc. 44-5, p. 13). According to Ms. Davis's diary entry for that day, Ms. Hunter was "ready to work." (Doc. 44-5, p. 13). Ms. Davis advised Ms. Hunter to visit Dr. Anakwenze again in November so that Dr.

Anakwenze could complete a "Treating Physician Return to Work" form, which BASF required all employees to obtain before returning from disability leave. (Doc. 40-6, p. 24; Doc. 44-5, p. 13; Doc. 43, p. 11). Ms. Davis noted that, once she received the return to work form, she would forward it to Ms. Pickett, who would then determine whether Ms. Hunter would need a second IME. (Doc. 44-5, p. 13).

On December 2, 2013, Ms. Hunter told Ms. Davis that Dr. Anakwenze had given her a completed Treating Physician Return to Work form on November 29, 2013. (Doc. 44-5, p. 9). Ms. Hunter did not provide BASF with the form. BASF ultimately obtained the form from Dr. Anakwenze's office on December 19, 2013, after making multiple requests for the form between December 2, 2013 and December 19, 2013. (Doc. 44-5, pp. 7–9). Ms. Davis also received a return to work form on December 2, 2013 from Ms. O'Steen. (Doc. 44-5, p. 7).

After consulting with Ms. Pickett, Ms. Davis scheduled a second IME for Ms. Hunter with Dr. Caruso. (Doc. 44-5, pp. 6–7). On January 16, 2014, Dr. Caruso met with Ms. Hunter and determined that she could return to work. (Doc. 44-5, p. 2). Ms. Davis shared the results of Dr. Caruso's examination with Ms. Pickett, who informed Ms. Morgan via email on January 23, 2014 that Ms. Hunter had "been released to return to work without restrictions." (Doc. 44-5, p. 1).

Ms. Morgan replied that BASF "did not have a position open for [Ms. Hunter] so we offered severance and are ending her employment." (Doc. 44-5, p. 1). Unbeknownst to Ms. Davis and Ms. Pickett, during Ms. Hunter's leave, BASF had issued a company-wide headcount directive that required Ms. Morgan to maintain her employee headcount as it was set on October 31, 2013. (Doc. 40-6, ¶¶ 12–13, 17; Doc. 43, p. 13). Because Ms. Hunter was on disability leave on October 31, 2013, Ms. Morgan did not include Ms. Hunter in the headcount. (Doc. 40-6, ¶ 18; Doc. 43, p. 13).

## III. DISCUSSION

Ms. Hunter asserts two claims under the ADA. First, Ms. Hunter alleges that BASF discriminated against her by failing to reasonably accommodate her disability. (Doc. 1, ¶ 25). Second, Ms. Hunter alleges that BASF terminated her employment in retaliation for requesting disability leave in June of 2013 and for filing a charge of discrimination with the EEOC in 2012.[1] (Doc. 52, p. 14 n. 4, p. 23; Doc. 43, p. 26; Doc. 40-1, p. 62).[2] The Court examines Ms. Hunter's claims in turn.

---

[1] Ms. Hunter filed two charges of discrimination with the EEOC. The first from 2012 related to harassment that Ms. Hunter alleges she experienced after a shoulder injury in 2009. (Doc. 40-1, pp. 38, 62). Ms. Hunter filed her second charge in June of 2014 after BASF had terminated her employment. (Doc. 40-1, p. 38). Ms. Hunter alleges that BASF terminated her employment in retaliation for her filing the 2012 charge. (Doc. 40-1, p. 62).

[2] Ms. Hunter voluntarily dismissed a third claim for hostile work environment. (Doc. 22; Doc. 1, pp. 7–9).

### 1. Failure to accommodate

The ADA prohibits an employer from "discriminat[ing] against a qualified individual on the basis of disability." 42 U.S.C. § 12112(a). An employer discriminates against an otherwise qualified employee by "not making reasonable accommodations to the known physical or mental limitations of [the] employee, unless [the employer] can demonstrate that the accommodation would impose an undue hardship" on the employer's business operations. 42 U.S.C. § 12112(b)(5)(A). Compared to other forms of discrimination under the ADA, the analysis for failure-to-accommodate claims is streamlined. There is no burden on the employer to articulate legitimate, non-discriminatory reasons for its actions or on the plaintiff to establish pretext. *Holly v. Clairson Indus., L.L.C.*, 492 F.3d 1247, 1262 (11th Cir. 2007); *see also Abram v. Fulton Cty. Gov't*, 598 Fed. Appx. 672, 676 (11th Cir. 2015). If an employer fails to reasonably accommodate an otherwise qualified disabled employee, and the employer cannot show that accommodating the employee would have imposed an undue hardship, then the employer has violated the ADA. *See Holly*, 492 F.3d at 1262.

To survive summary judgment, Ms. Hunter "need only show that [her proposed] 'accommodation' seems reasonable on its face, *i.e.*, ordinarily or in the run of cases." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401 (2002). If Ms. Hunter does that, then BASF "must show special (typically case-specific)

circumstances that demonstrate undue hardship in the particular circumstances." *Barnett*, 535 U.S. at 402. If Ms. Hunter cannot show that her proposed accommodation is reasonable in the run of cases, then she still may defeat summary judgment by showing that "special circumstances warrant a finding that . . . the requested 'accommodation' is reasonable on [her] particular facts." *Id.* at 405; *see also Terrell v. USAir*, 132 F.3d 621, 626 (11th Cir. 1998) ("Whether an accommodation is reasonable depends on [the] specific circumstances [of each case].").

The United States Supreme Court determines whether a given accommodation is reasonable in the run of cases, in part, by examining "[a]nalogous case law." *Barnett*, 535 U.S. at 403. In *Barnett*, the Court held that a disabled employee's request to be assigned to "a particular position even though another employee is entitled to that position under the employer's 'established seniority system'" is "ordinarily" not reasonable. *Barnett*, 535 U.S. at 406. To support its conclusion, the Court cited a body of case law in which it and lower courts had held that neither Title VII nor the Rehabilitation Act nor the ADA requires an employer to violate its seniority system to accommodate a disabled employee. *See id.* at 403–04. As a result, the plaintiff in *Barnett* needed to "explain why, in [his] particular case, an exception to the employer's seniority

8

policy can constitute a 'reasonable accommodation' even though in the ordinary case it cannot." *Id.* at 406.[3]

Applying this analytical framework to the facts of this case, the Court finds that Ms. Hunter did not request an ordinarily reasonable accommodation. As the Eleventh Circuit Court of Appeals has explained, an employer does not violate the ADA "'by refusing to grant [an employee] a period of time in which to cure his disabilities where the employee sets no temporal limit on the advocated grace period, urging only that he deserves sufficient time to ameliorate his conditions." *Wood v. Green*, 323 F.3d 1309, 1313 (11th Cir. 2003) (quoting *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1226 (11th Cir. 1997)) (citation and internal quotation marks omitted) (alteration in original). When Ms. Hunter requested leave in June of 2013, she did not indicate when she would be able to return to work. Between then and October 24, 2013, when Dr. Anakwenze provided Ms. Hunter with a note clearing her for work and Ms. Hunter began consistently reporting that she was ready for work, Ms. Hunter's prognosis remained uncertain. (*See* Doc. 44-5).

During those four and a half months, Ms. Hunter "could not represent that [s]he likely would have been able to work within a month or two . . . and had no way of knowing when h[er] doctor would allow h[er] to return to work in any

---

[3] The Court suggested, for example, that the plaintiff might have been able to show "that the employer, having retained the right to change the seniority system unilaterally, exercises that right fairly frequently, reducing employee expectations that the system will be followed—to the point where one more departure, needed to accommodate an individual with a disability, will not likely make a difference." *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 405 (2002).

capacity." *Duckett*, 120 F.3d at 1226. Issued, as it was, after a series of revised projections regarding Ms. Hunter's return to work date, Dr. Caruso's September 19, 2013 suggestion that Ms. Hunter may be able to return to work in six to eight weeks "assuming that medications adjustments are effective" does not constitute the sort of "temporal limit" demanded by *Duckett*. *See Duckett*, 120 F.3d at 1226 (citation and internal quotation marks omitted). Between June 10 and October 24, 2013, "the course of [Ms. Hunter's] health was too uncertain" to provide a reliable basis for determining when she might be able to return to work. *Duckett*, 120 F.3d at 1226. Ordinarily, the ADA does not require an employer to hold an employee's job open under such indefinite circumstances. *See Wood*, 323 F.3d at 1314; *Duckett*, 120 F.3d at 1226.

Consistent with *Barnett* and *Terrell*, however, the Court must consider the particular facts of Ms. Hunter's case. *Barnett*, 535 U.S. at 405; *Terrell*, 132 F.3d at 626; *see also* See *Garcia-Ayala v. Lederle Parenterals, Inc*, 212 F.3d 638, 648 (1st Cir. 2000) (explaining that "[e]ach case must be scrutinized on its own facts"). Ms. Hunter's facts, viewed in the light most favorable to her, suggest that BASF could reasonably have held her position open, even though during the first four and a half months of her leave, Ms. Hunter was unable to provide a definite timeframe for her accommodation.

Ms. Hunter's job was not specialized, and under BASF policy, she was entitled to return to her job within six months of the date on which her leave began. (*See* Doc. 40-1, pp. 20–21; Doc. 40-3, p. 14). BASF had the personnel, the organizational infrastructure, and the financial resources to tolerate Ms. Hunter's absence for the duration of her leave and then reintegrate her into its workforce. BASF's 26-week short-term disability leave policy, although not "federally mandated, simply because [BASF] elect[ed] to establish it as a matter of policy," is evidence of BASF's ability to withstand an employee's extended absence. *Duckett*, 120 F.3d at 1225 (quoting *Myers v. Hose,* 50 F.3d 278, 284 (4th Cir.1995)) (alteration provided by *Duckett*); (Doc. 40-3, p. 14).

Furthermore, although Ms. Hunter initially provided no timeframe for her leave, on October 24, 2013, Ms. Hunter's proposed accommodation became less indefinite. On that day, Ms. Hunter began consistently reporting to Ms. Davis that she was ready to return to work, and Ms. Hunter possessed a prescription slip from Dr. Anakwenze on which the doctor had written that Ms. Hunter could return to work without restrictions. (Doc. 40-4, p. 54; Doc. 44-5, pp. 9–13). As of October 24, 2013, Ms. Hunter "could [] represent that [s]he likely would have been able to work within a month or two" and in fact knew "when h[er] doctor would allow h[er] to return to work." *Duckett*, 120 F.3d at 1226. The only reason she did not return to work in October is that BASF required her to obtain a "Treating

Physician Return to Work form" signed by Dr. Anakwenze and to undergo a second IME with Dr. Caruso.  (*See* Doc. 40-6, pp. 23–24; Doc. 44-5, p. 6).  The Court does not suggest that BASF should have violated its own policies by reinstating Ms. Hunter on October 24, 2013 without the appropriate documentation from Dr. Anakwenze and without the benefit of a second IME.[4]  But, the Court finds inconsistent with the aims of the ADA the notion that an employer may use its own mechanisms to delay an employee's return to work and thereby transform a reasonable accommodation into an unreasonable one.

BASF contends that it did not preserve Ms. Hunter's job because of the headcount that the company performed on October 31, 2013.  (Doc. 43, p. 4, Doc. 51, pp. 3–10).   However, on October 24, 2013—seven days before the implementation of the headcount and well within Ms. Hunter's six-month period of leave—BASF knew that Ms. Hunter wished to return to work.  (Doc. 44-5, p. 13).  BASF also knew that Dr. Anakwenze had cleared Ms. Hunter to return to work. (Doc. 44-5, p. 13).   BASF could have reasonably accommodated Ms. Hunter by counting her as an employee—which she was—during the headcount and holding her position open until Ms. Hunter could fulfill the requirements that BASF

---

[4] BASF's internal procedures require employees to submit a completed "Treating Physician Return to Work form" to return to work following disability leave.  Likewise, BASF's determination that Ms. Hunter needed a second IME before returning to work was consistent with the company's standard procedures with respect to employees with behavioral health issues who operate heavy machinery or who require "complex leaves." (Doc. 40-4, p. 7; Doc. 40-6, ¶¶ 14–15).

imposed regarding her return to work. Such an accommodation may have required little more than a conversation between Ms. Morgan and Ms. Pickett regarding the identities of BASF employees on short-term disability at the time of the headcount.

By expressing her desire to return to work on October 24, 2013, Ms. Hunter effectively made a second request for accommodation: that BASF hold her job open until she could comply with BASF's reinstatement requirements. *See Frazier-White v. Gee*, 818 F.3d 1249, 1255–56 (11th Cir. 2016) ("[g]enerously construing" a plaintiff's communications to her employer to find that the plaintiff had made a "specific demand for an accommodation" and thereby triggered the employer's duty). A jury could find that, under the circumstances of this case, Ms. Hunter's request was reasonable and that BASF discriminated against Ms. Hunter by eliminating her job while she was on short-term disability leave.

BASF does not argue that accommodating Ms. Hunter would have imposed an undue hardship on its business operations. Rather, BASF argues only that Ms. Hunter's proposed accommodation was unreasonable. (*See* Docs. 43, 55). In any event, none of the factors that Congress has instructed courts to consider in determining whether an accommodation would impose an undue hardship on an employer weighs in favor of BASF. *See* 42 U.S.C. § 12111(10)(B). Accordingly, the Court denies BASF's motion for summary judgment with respect to Ms. Hunter's failure to accommodate claim.

### 2. Retaliatory discharge

Ms. Hunter alleges that BASF terminated her employment in retaliation for requesting disability leave and for filing a charge of discrimination with the EEOC. (Doc. 52, p. 14 n. 4, p. 23; Doc. 43, p. 26; Doc. 40-1, p. 62). Because Ms. Hunter has provided no evidence that her termination was causally related to either her request for leave or her EEOC discrimination charge, she has not established a prima facie case of retaliation under the ADA.

"To establish a prima facie case of retaliation under the ADA, a plaintiff must show that (1) she engaged in statutorily protected expression; (2) she suffered an adverse . . . action; and (3) the adverse action was causally related to the protected expression." *Higdon v. Jackson*, 393 F.3d 1211, 1219 (11th Cir. 2004) (citation and internal quotation marks omitted) (alteration in original). To satisfy the "causal link" element of this test, Ms. Hunter must show that her protected expression was the but-for cause of BASF's decision to terminate her employment. *See Frazier-White*, 818 F.3d at 1258.

Ms. Hunter filed her charge with the EEOC in May of 2012. (Doc. 40-1, p. 38). She requested leave following her mental breakdown in June of 2013. (Doc. 46, p. 2). BASF did not terminate Ms. Hunter's employment until January of 2014. Ms. Hunter's claim lacks the "close temporal proximity" between protected expression and adverse action that courts have held can constitute "sufficient

circumstantial evidence . . . for purposes of a prima facie case." *Higdon*, 393 F.3d at 1220. Indeed, the record contains no evidence, circumstantial or otherwise, that Ms. Hunter was fired because she filed an EEOC charge in 2012 or because she requested disability leave in June of 2013. Rather, the evidence shows that BASF terminated Ms. Hunter's employment because BASF did not include Ms. Hunter in the October, 2013 headcount. Accordingly, the Court grants BASF's motion for summary judgment with respect to Ms. Hunter's retaliation claim.

## IV.   CONCLUSION

For the reasons discussed above, the Court **DENIES** BASF's motion for summary judgment with respect to Ms. Hunter's failure to accommodate claim. (Doc. 42). The Court **GRANTS** BASF's motion for summary judgment with respect to Ms. Hunter's retaliatory discharge claim. (Doc. 42). The Court **DISMISSES** that claim **WITH PREJUDICE**.

Ms. Hunter's failure to accommodate claim will proceed to trial, and the Court will set that claim for a jury trial. The Court will provide the parties with additional instructions in a forthcoming pre-trial order. The Court asks the clerk to please **TERM** Doc. 42.

**DONE** and **ORDERED** this March 13, 2017.

_____
**MADELINE HUGHES HAIKALA**
UNITED STATES DISTRICT JUDGE

15